Shaw, J., dissents.
MURDOCK, Justice (concurring in part and concurring in the result).
I concur in that portion of the main opinion explaining the inapplicability of the limitation on discovery of quality-assurance information under § 22-21-8, Ala. Code 1975. I strongly disagree, however, with both the main opinion and the dissent as to their conclusion that the claims against the Tombigbee Healthcare Authority d/b/a Bryan W. Whitfield Memorial Hospital ("the hospital") are governed by the Alabama Medical Liability Act, § 6-5-480 et seq., Ala. Code 1975, and § 6-5-540 et seq., Ala. Code 1975 ("the AMLA").
This Court has held that the AMLA does not govern the liability of a health-care provider in relation to conduct that does not involve a deficiency in medical care. See Ex parte Vanderwall, 201 So.3d 525 (Ala. 2015) ; Ex parte Altapointe Health Sys., Inc., 249 So.3d 1108 (2017). The central premise of Vanderwall and Altapointe is that the AMLA was crafted by our legislature to govern cases where patients are injured as a result of their medical care. In Vanderwall, this Court expressly rejected the notion that tortious conduct was governed by the AMLA merely because it is committed by a health-care provider, even if it was committed at a place and time normally associated with the provision of medical care. In so doing, we expressly rejected the place-and-time rule articulated in Mock v. Allen, 783 So.2d 828 (Ala. 2000), noting that the "when and where" rule from Mock is "not plausible," that such a rule " 'does not accord with what is right and just,' " and that Mock was " 'wrong when decided.' " Vanderwall, 201 So.3d at 536 (citations omitted). In Altapointe, this Court described the place-and-time rule from Mock as "discredited" and rejected the appellant's attempt to have us resurrect and apply that rule. I am greatly concerned that both the main opinion and the dissent reflect a contrary view that undermines the central premise and the precedential import of Vanderwall and Altapointe.
The main opinion takes the position that a hospital's negligence in hiring or supervising a radiology technician who the hospital knows or should know is a sexual predator may be characterized as "medical negligence" under the AMLA. 260 So.3d at 4 ("In other words, the hospital asserts that the plaintiffs' claim against it is not a claim alleging sexual assault but, rather, an independent claim of medical negligence stemming from the hospital's ... alleged negligent and/or wanton hiring, training, supervision, and retention of Taylor. We agree." (emphasis added)). I cannot agree. I am unable to conclude that the claim at issue in this case involves "medical negligence." I therefore cannot conclude that the AMLA governs the disposition or litigation of that claim. It is for this reason, and not for the reasons offered by the main opinion, that I conclude that § 6-5-551, Ala. Code 1975, does not prohibit the plaintiffs from seeking information from the hospital concerning "other incidents" or complaints involving Leland Bert Taylor, Jr.
*10 By its terms, the AMLA applies "[i]n any action for injury or damages or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care." Ala. Code 1975, § 6-5-548 (emphasis added); see also Vanderwall, 201 So.3d at 533. Likewise, the limitation on discovery under § 6-5-551 of the AMLA applies "[i]n any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care."[3] (Emphasis added.) As we explained in Vanderwall, the "standard of care" referenced in the AMLA is the degree of care that must be used by a health-care provider acting "within the ambit of 'medical treatment' or 'providing professional services.' " Vanderwall, 201 So.3d at 537.
" '[T]he AMLA applies to conduct that is, or that is reasonably related to, the provision of health-care services allegedly resulting in a medical injury. Just as the Alabama Legal Services Liability Act does not apply to every action against a person who is a lawyer, see Cunningham v. Langston, Frazer, Sweet & Freese, P.A., 727 So.2d 800 (Ala. 1999), the AMLA does not apply to every action against a person who is a doctor, see Thomasson v. Diethelm, 457 So.2d 397 (Ala. 1984).... Although Mock's claims arise out of conduct that took place at a time when there was a doctor-patient relationship for the purpose of examination and treatment, see Thomasson , that fact alone cannot subject to the provisions of the AMLA all conduct by the doctor, however unrelated to the provision of medical services.' "
Vanderwall, 201 So.3d at 537 (quoting, "as the correct interpretation of AMLA," Justice Lyons's dissenting opinion in Mock v. Allen, 783 So.2d 828, 836-37 (Ala. 2000) (emphasis added in Vanderwall )).
"In short, the simple fact is that sexual misconduct by a health-care provider toward a patient is not medical treatment, and it does not result in a 'medical injury' as such an injury is understood under the AMLA. The AMLA addresses the provision of medical services to patients and failures to meet the applicable standard of care in providing those services. M.C.'s action against Vanderwall is not concerned with such matters. Accordingly, the trial court did not err in granting M.C.'s motion to compel discovery on the ground that the AMLA does not govern M.C.'s claims against Vanderwall."
Vanderwall, 201 So.3d at 540 (emphasis added); see also Altapointe, 249 So.3d at 1113 ("The gravamen of Avnet's complaint is that Altapointe negligently and wantonly failed to safeguard Hunter from such an attack [assault and battery by another patient]. There are no express allegations of medical negligence.... Because there is no evidence before us that would permit us to conclude that the assault on Hunter was somehow linked to the administration of medical care or professional services by *11 Altapointe, we cannot say that the AMLA applies to Avnet's claims.").
The clause in § 6-5-551 referencing "the standard of care" is followed by a second, dependent clause. As a dependent clause, the latter clause does not expand the boundaries established in the first clause's reference to "the standard of care." Specifically, § 6-5-551 states that the AMLA applies to a "breach of the standard of care" (clearly a reference to the medical standard of care), before proceeding to state: "whether resulting from acts or omissions in providing health care, or the hiring, training, supervision, retention, or termination of care givers." Thus, the acts to which § 6-5-551 applies, whether "acts or omissions in providing health care" or "the hiring, training, supervision, retention, or termination of care givers," must first involve a breach of the "standard of care," i.e., medical care by a medical caregiver. "Medical care" by a "medical caregiver" is the only type of conduct that triggers the application of the AMLA.
Obviously, a hospital exists to provide medical care. Just as obviously, however, that fact does not make all tortious conduct that occurs in a hospital facility at the hands of one employed by the hospital subject to the limitations imposed by the AMLA. If it did, the AMLA would govern claims for injuries resulting from the negligent mopping of floors by a hospital employee, the negligent installation or maintenance of HVAC equipment by a hospital employee, the negligent maintenance or repair of a doorway threshold by a hospital employee, or the negligent maintenance or repair of a stairway railing by a hospital employee. Indeed, it would apply to claims arising from injuries resulting from such acts of negligence even if such acts were performed by a physician or nurse employed by the hospital, or the more plausible scenario of a hospital-employed physician or nurse-or radiology technician-spilling a drink on a hospital floor that causes a third party to slip and fall. The point is that such activities or the hiring or supervision by a hospital of those who engage in such activities does not involve the provision of medical care within the meaning of the AMLA. Disputes over injuries arising from such activities simply do not involve the type of "care" the legislature was addressing when discussing the "standard of care" in the AMLA. See Ala. Code 1975, § 6-5-540 ("It is hereby declared by the Legislature of the State of Alabama that a crisis threatens the delivery of medical services to the people of Alabama and the health and safety of the citizens of this state are in jeopardy.... [I]t is the declared intent of this Legislature to insure that quality medical services continue to be available at reasonable costs to the citizens of the State of Alabama. This Legislature finds and declares that the increasing threat of legal actions for alleged medical injury causes and contributes to an increase in health care costs and places a heavy burden upon those who can least afford such increases, and that the threat of such actions contributes to expensive medical procedures to be performed by physicians and other health care providers which otherwise would not be considered necessary, and that the spiraling costs and decreasing availability of essential medical services caused by the threat of such litigation constitutes a danger to the health and safety of the citizens of this state, and that this article should be given effect immediately to help control the spiraling cost of health care and to insure its continued availability." (emphasis added)); Ala. Code 1975, § 6-5-549.1(b) ("[I]t is the declared intent of this Legislature to ensure that quality medical services continue to be available at reasonable costs to the citizens of the State of *12 Alabama. The continuing and ever increasing threat of legal actions for alleged medical injury causes and contributes to an increase in health care costs and places a heavy burden on those who can least afford such increases. The threat of such actions contributes to the performance of expensive medical procedures by physicians and other health care providers which otherwise would not be considered necessary. The spiraling cost and decreasing availability of essential medical services caused by the threat of litigation constitutes a danger to the health and safety of the citizens of this state.... [T]he increasing threat of legal actions for alleged medical injury has resulted in a continuing limitation on the number of physicians providing specialized health care in this state." (emphasis added)).
By the same token, the legislature did not purpose to protect physicians from complaints alleging that the physician has sexually abused a patient. See Vanderwall and Altapointe, supra. By the same token, the legislature did not purpose to protect hospitals from complaints alleging that the hospital negligently hired or negligently supervised a physician who sexually abuses a patient. Such activities do not concern the provision of "medical care" any more than do the other nonmedical activities referenced above (involving the maintenance of hospital premises, etc.). To the extent the AMLA concerns hiring, supervision, etc., of caregivers, such concern is solely with the hiring, supervision, etc. of caregivers qua caregivers. The AMLA does not govern the hiring of caregivers who become tortfeasors apart from the provision of medical care.
Based on the foregoing, the AMLA is inapplicable to the direct-liability claim (the hospital's allegedly negligent or wanton hiring, training, supervision, or retention of Taylor) in the present case. Sexual molestation has no relation to the provision of medical care, see Vanderwall, 201 So.3d at 537 ("We do not believe the legislature intended for the protections afforded under the AMLA to apply to health-care providers who are alleged to have committed acts of sexual assault; such acts do not, by any ordinary understanding, come within the ambit of 'medical treatment' or 'providing professional services.' "), and the AMLA does not address anyone's liability in relation to sexual molestation, whether that of a physician who commits such molestation or of a hospital that negligently hires, trains, supervises, or retains someone who commits such molestation.
The AMLA governs liability and related discovery standards only when the plaintiff's alleged injury results from the negligent or wanton provision of medical care; the fact that a health-care provider is named as a defendant is insufficient, in itself, to summon the protections of the AMLA. If a radiology technician sexually molests a patient, the AMLA no more applies to that activity than it does to a hospital-maintenance employee's engaging in that same activity. Likewise, the AMLA no more applies to the hospital's alleged negligent hiring, training, supervision, or retention of that technician vis-à-vis such activity than it does to the hospital's hiring, training, supervision, or retention of the maintenance employee vis-à-vis such activity.
The alleged misdeed of the hospital in the present case does not raise any question as to whether the hospital engaged in sound hiring or supervisory practices in relation to the quality of Taylor's actions as a radiology technician but, rather, whether the hospital engaged in sound hiring and supervisory practices as to a matter unrelated to medical care. The AMLA, including the discovery limitations of § 6-5-551 and other provisions, therefore is *13 not applicable. To hold otherwise would mean that an AMLA action depends merely on the location and timing of the individual health-care provider's wrongful acts (i.e., whether he or she was on duty in a hospital or a doctor's office), rather than to the type of wrongful acts in which the defendant allegedly engaged.[4] Such a holding would not merely erode Vanderwall, it effectively would eviscerate it. Indeed, I posit that if the applicability of the AMLA is not limited to actions involving the services of a caregiver as a caregiver, then Vanderwall was wrongly decided and we are sub silentio overruling it. If we focus solely on the language of the dependent clauses in § 6-5-551 noted above so as to make an AMLA action merely a matter of timing and location of the allegedly wrongful acts, not whether the defendant's acts relate to the "standard of [medical] care," why did we reject that approach as determinative in Vanderwall? See 201 So.3d at 536 ("[T]he alleged sexual misconduct occurred in the place and during the time that Vanderwall otherwise was engaged in treating M.C. for her back pain. Thus, under the interpretation of the AMLA enunciated in Mock[ v. Allen, 783 So.2d 828 (Ala. 2000),] and reiterated in O'Rear[ v. B.H., 69 So.3d 106 (Ala. 2011) ], M.C.'s allegation of sexual misconduct would be governed by the proof requirements of the AMLA. We cannot in good conscience, however, continue to adhere to the rule articulated in Mock and O'Rear.").
The dissent acknowledges Vanderwall, but I would argue that the position taken in the dissent is more aligned with the view expressed by its author in his dissent in Vanderwall. See Vanderwall, 201 So.3d at 542-44 (Shaw, J., dissenting). A similar argument could be made as to the main opinion.[5] But, as we have held, it is not merely any negligence of a health-care provider occurring in a health-care setting that triggers the application of the AMLA to that provider or his or her employer. The clearly established rule, at least before today, was simply whether the cause of action concerns "the provision of medical services to [a] patient[ ] and failures to meet the applicable standard of care in providing those [medical] services." Vanderwall, 201 So.3d at 540. That rule no longer appears so clear.

Section 6-5-551 states in relevant part:
"In any action for injury, damages, or wrongful death, whether in contract or in tort, against a health care provider for breach of the standard of care, whether resulting from acts or omissions in providing health care, or the hiring, training, supervision, retention, or termination of care givers, the Alabama Medical Liability Act shall govern the parameters of discovery and all aspects of the action. The plaintiff shall include in the complaint filed in the action a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to plaintiff and shall include when feasible and ascertainable the date, time, and place of the act or acts."
(Emphasis added.)

To hold otherwise also would mean that other provisions of the AMLA would be applicable. For example, the plaintiff would be required to present expert testimony from a "similarly situated health care provider" as to the vetting processes used by hospitals for matters unrelated to medical care, including to what degree background checks, criminal and otherwise, must be conducted; to what extent a hospital must require references and contact those references; to what extent a review of social media is required in this day and age, etc. See Ala. Code 1975, § 6-5-548 (expert-testimony requirements). I am unaware of any AMLA action where the AMLA statutory requirement for expert testimony as to the standard of care has been extended to the hiring practices of hospitals as those practices relate to criteria unrelated to the provision of medical services.

See Altapointe, 249 So.3d at 1120 (Sellers, J., concurring in part and dissenting in part):
"I believe that, once it is established that a defendant is a health-care provider, then § 6-5-548, Ala. Code 1975, bars discovery of insurance limits. Notwithstanding that the act that is the subject of litigation may not have been related to the provision of medical services, once a threshold determination is made that the defendant is a health-care provider, insurance limits are not discoverable."
(Emphasis added.)